**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JONATHAN TURNBULL-REILLY, | **Civil Action No.** 6:26-cv-06512 (EAW) |
| Plaintiff, | **AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |
| v. | |
| HUBSPOT, INC. and VARUN KHANNA, | |
| Defendants. | |

## PRELIMINARY STATEMENT

1. This case arises from a straightforward and documented pattern. Jonathan Turnbull-Reilly joined HubSpot, Inc. as an Engineering Lead in June 2024, receiving a written management-focused mandate agreed upon by his supervisor shortly thereafter. Before his parental leave, his performance was considered "generally satisfactory." When he returned, his supervisor treated the leave as a vacancy in his record rather than a protected absence, evaluated him against a period that mathematically included weeks spent caring for a newborn at home on leave, and reversed the agreed-upon role expectations, shifting emphasis from management to coding after the fact. He was placed on a performance improvement plan exactly fourteen days after his first formal complaint to Human Resources. He was terminated nine days after he identified himself to HubSpot's compliance department as the employee who had reported a significant data privacy violation.

2. The pattern is not subtle. Each of four distinct protected activities, including parental leave disclosures, HR complaints about leave-based discrimination, an external whistleblower filing, and formal self-identification as the whistleblower, was followed promptly by a new or heightened adverse action. HubSpot's own Employee Relations representative described the mid-PIP

extension as "highly non-standard." HubSpot closed both its investigation of Plaintiff's discrimination complaints and its investigation of the reported data privacy violation on the same day, within hours of each other, three days before termination. This complaint seeks redress for that pattern.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over Plaintiff's federal claims under 28 U.S.C. §§ 1331 and 1343(a)(3)–(4), which confer original jurisdiction over civil actions arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

4. This Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367(a), because those claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

5. Venue is proper in this District under 28 U.S.C. § 1391(b)(1)–(2). Plaintiff resides in the Western District of New York, and a substantial part of the acts and omissions giving rise to these claims occurred within this District, including the adverse employment actions directed at a remote employee whose designated workplace was his home in Rochester, New York.

6. Venue is also proper under 42 U.S.C. § 2000e-5(f)(3), which authorizes suit in the judicial district in which the unlawful employment practice is alleged to have been committed, in which the employment records relevant to such practice are maintained and administered, or in which the aggrieved person would have worked but for the alleged unlawful employment practice.

7. Plaintiff has exhausted his administrative remedies with respect to his Title VII claims. On or about July 9, 2025, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission, assigned Charge No. 525-2025-02445. The EEOC issued a Notice of Right to Sue, which Plaintiff received on February 6, 2026, a true and accurate copy of which is

attached hereto as Exhibit 3. This Complaint is filed within ninety days of Plaintiff's receipt of that Notice, as required by 42 U.S.C. § 2000e-5(f)(1).

8. No administrative exhaustion is required for Plaintiff's claims under the New York State Human Rights Law, N.Y. Exec. Law § 296, or under New York Labor Law § 740. Plaintiff elects to pursue those claims in this Court pursuant to 28 U.S.C. § 1367.

## THE PARTIES

### Plaintiff

9. Jonathan Turnbull-Reilly is an individual domiciled in Rochester, New York 14610, within the Western District of New York. He was employed by HubSpot, Inc. as an Engineering Lead from June 17, 2024, through June 6, 2025, when he was terminated.

### Defendant HubSpot, Inc.

10. Defendant HubSpot, Inc. ("HubSpot") is a Delaware corporation with its principal place of business at 25 First Street, Cambridge, Massachusetts 02141. HubSpot is publicly traded on the New York Stock Exchange under the ticker symbol HUBS. HubSpot is registered to do business in the State of New York, maintains employees in New York, and derives substantial revenue from customers in New York. At all relevant times, HubSpot employed more than five hundred employees and is an "employer" within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b), the New York State Human Rights Law, N.Y. Exec. Law § 292(5), and New York Labor Law § 740. HubSpot acted through its agents, employees, and supervisors, all of whom were acting within the scope of their employment at all relevant times.

### Defendant Varun Khanna

11. Defendant Varun Khanna is an individual who, at all relevant times, was employed by HubSpot as an Engineering Manager and served as Plaintiff's direct supervisor. Khanna held decision-making

authority over Plaintiff's performance evaluations, compensation, performance improvement plan, and termination. Upon information and belief, Khanna resides in or is subject to personal jurisdiction in this District by virtue of his employment-related conduct directed at Plaintiff in New York. Khanna is sued in his individual capacity for violations of the New York State Human Rights Law, N.Y. Exec. Law §§ 296(1) and 296(6).

## FACTUAL ALLEGATIONS

### A.  Hiring and Pre-Employment Disclosures

12. On May 15, 2024, Plaintiff accepted an offer of employment from HubSpot as an Engineering Lead, reporting to Varun Khanna. The offer letter set Plaintiff's base salary at $232,000 per year, subsequently adjusted to $245,000, with total compensation of approximately $395,000 per year including restricted stock units.

13. At the time of hire, Khanna had no knowledge of any pregnancy in Plaintiff's family. The hiring decision was made independent of any parental or familial status.

14. On May 24, 2024, nine days after accepting the offer, Plaintiff voluntarily disclosed at a pre-start meeting with Khanna that his wife was pregnant with a due date in November 2024. Plaintiff expressed a desire to minimize disruption to his team and communicated approximate dates for a forthcoming parental leave period.

15. At that same meeting, the scope of Plaintiff's role was established. Plaintiff was hired to lead two engineering teams, Global Navigation and Global Notifications, with five direct reports and a technical lead to mentor. Khanna proposed expanding Plaintiff's scope to include a third team, Global Home, a greenfield initiative with significant executive visibility that has since become the default landing-page dashboard across HubSpot's entire product.

## B.  The Written Management-Focus Agreement

16. Plaintiff began employment on June 17, 2024. His onboarding included general company orientation and rotations with each of his teams.

17. On August 5, 2024, Plaintiff and Khanna held a meeting, reflected in shared meeting notes, dedicated to "realistic goal-setting prior to parental leave." The priorities Khanna set for Plaintiff's pre-leave period were organized under three headings: EXECUTION (Global Home planning and technical design; setting up both teams to execute for Q4/Q1), PLANNING (Q4 roadmap, 2025 dependency mapping, Notifications technical plan), and PEOPLE MANAGEMENT (coaching direct reports). No coding output metrics or targets appeared anywhere in the pre-leave priority framework.

18. On September 9, 2024, Plaintiff's first day in his full manager role, Khanna sent Plaintiff a written Slack message, a true and accurate copy of which is attached hereto as Exhibit 1, establishing an explicit priority framework for the role. Khanna designated Global Home planning and execution as Priority Zero and planning and performance management as Priority One. Technical team contributions, including pull requests, code review, and similar output, were listed separately as activities that "run in parallel always" and that Plaintiff "can also decide to delegate some of these as needed." As to coding contributions specifically, Khanna wrote: "What you should contribute to can based on the priority list or operational load." (Ex. A.)

19. During the entirety of Plaintiff's pre-leave period, both parties' understanding was uniformly oriented toward management performance. Technical output was discussed in the context of career advancement opportunities, not as a condition of continued employment.

## C.  Parental Leave

20. On November 27, 2024, Plaintiff's son was born. Plaintiff began parental leave under HubSpot's voluntary company parental leave policy. Plaintiff was not eligible for leave under the

Family and Medical Leave Act because he had not yet completed twelve months of employment. His leave was governed solely by HubSpot's parental leave policy.

21. On January 29, 2025, while Plaintiff was still on parental leave, Khanna informed him that one of his two teams, Global Notifications, had been transferred to another supervisor without Plaintiff's input. Khanna also told Plaintiff that the Senior Engineering Manager role Plaintiff had been positioned to grow into would be filled by someone else. Both changes occurred without consultation with Plaintiff and in his absence.

22. At the January 29 meeting, Plaintiff told Khanna he was experiencing significant sleep deprivation from caring for his newborn. Khanna's response to this disclosure, and to subsequent similar disclosures, is described below.

#### D.  Return from Leave and the Inflection Point

23. Plaintiff returned from parental leave on February 6, 2025.

24. On February 18, 2025, twelve days after Plaintiff's return, Khanna introduced a revamped "Engineering Values" framework stating that employees in Plaintiff's role were "engineers first, managers second." This directly reversed the priority framework Khanna had established in writing on September 9, 2024. Khanna made this reorientation a recurring basis for his subsequent criticism of Plaintiff's performance.

25. On February 21, 2025, Plaintiff again mentioned to Khanna that he was experiencing sleep deprivation from caring for his newborn. Khanna responded by asking, "What does your wife do?" Plaintiff understood the question, asked in the context of a discussion about nighttime childcare, as reflecting Khanna's assumption that responsibility for overnight infant care was, or should be, the wife's domain rather than Plaintiff's. Plaintiff explained his wife's professional employment in response.

26. On February 25, 2025, Plaintiff received his six-month performance review. He received a rating of 3 out of 5, which Khanna described as the rating "the vast majority of employees receive." The overall tone was positive. Code contributions were identified as a "growth area" for future promotion advancement, not as a disciplinary concern or a condition of continued employment. Khanna discussed three potential career paths with Plaintiff and awarded him a 6% raise. Plaintiff requested a mentor at this meeting; that request was later denied.

27. On March 11, 2025, during a one-on-one meeting, Plaintiff added an agenda item to confirm the dates of his remaining parental leave for August and early September 2025. Immediately following that disclosure, Khanna's assessment of Plaintiff's performance shifted dramatically. For the first time, Khanna told Plaintiff he was "absolutely not meeting expectations" on code contributions and needed to sharply increase his output. Khanna stated that Plaintiff had "been here almost a year" without making "major contributions," a timeframe that mathematically encompasses Plaintiff's ten weeks of parental leave and his three months of management-focused onboarding.

28. The contrast between the February 25 "generally satisfactory" review and the March 11 "absolutely not meeting expectations" declaration is not explained by any documented change in Plaintiff's actual performance. The only intervening event was Plaintiff's announcement of his upcoming parental leave.

### E.  First HR Complaint

29. On March 20, 2025, Plaintiff submitted a formal complaint to HubSpot's Human Resources department. His complaint stated: "I've just come back from parental leave and the pressure is immense — to the point where it's affecting my health." He requested a transfer to a different team.

30. On April 3, 2025, Plaintiff met with Jasmine Daniels, HubSpot's Employee Relations Partner assigned to handle the complaint. Plaintiff outlined his concerns: his parental leave had "put me

in a precarious position," he could not push back on his workload without risking adverse consequences, and the time he spent on leave was being counted against him in performance evaluations. Plaintiff also explained his reluctance to raise these concerns directly with Khanna because he feared retaliation.

31. HubSpot's Employee Relations function offered no investigation, no mediation, and no alternative remediation pathway. Plaintiff was told that his only option was to address his concerns directly with Khanna.

32. On or around March 27, 2025, Plaintiff's physician prescribed medication for insomnia and anxiety attributable to workplace stress.

33. Shortly thereafter, Daniels departed on her own parental leave. HubSpot assigned Craig Belinfanti, an Employee Relations Partner, to assume responsibility for Plaintiff's complaint going forward. Belinfanti became the primary HubSpot Employee Relations contact for all subsequent events in this matter.

**F. PIP Placement**

34. On April 18, 2025, exactly fourteen days after Plaintiff's HR complaint meeting, Khanna placed Plaintiff on a Performance Improvement Plan with a stated end date of May 16, 2025, and memorialized the PIP in a written email to Plaintiff, a true and accurate copy of which is attached hereto as Exhibit 2. The PIP required multiple pull requests per week in addition to management responsibilities. Verbally, Khanna set an expectation of approximately one pull request per day.

35. The stated basis for the PIP, insufficient code contributions, directly contradicted the priority framework Khanna himself had established in writing on September 9, 2024. When Plaintiff reminded Khanna of that agreement at the April 18 meeting, Khanna acknowledged it but stated he was evaluating Plaintiff using "the whole picture" of his time in the role. That framing encompassed Plaintiff's ten-week parental leave, during which no code contributions would be expected of any employee on approved leave, and his three months of management-focused onboarding. (Ex. B.)

8

36. The April 18 PIP email also reveals that Khanna applied a dual performance standard: Plaintiff was required both to "meet the EL bar" and to "show readiness for SSWE2." (Ex. B2.) The Senior Software Engineer II role is an advanced individual contributor position on the technical career track, distinct from the Engineering Lead management role for which Plaintiff was hired. By folding Senior Software Engineer II readiness into the PIP evaluation criteria, Khanna imposed requirements that went beyond the scope of Plaintiff's actual role.

37. Just prior to the PIP, facing circumstances in which he reasonably understood his continued employment to be at risk and his available options to be narrowing, Plaintiff expressed interest in exploring a transition to the Senior Software Engineer II track as a way to transfer from under Khanna's direct supervision. That expression of interest, made in an attempt to preserve his employment under conditions of economic duress, does not constitute a voluntary election to be evaluated against Senior Software Engineer II criteria or ratify the use of those criteria as a basis for terminating an employee hired and retained in an Engineering Lead management role.

In March 2025, Plaintiff had submitted nine pull requests, with contributions delivered every week of the month, in addition to coordinating a major release for the Global Home project. Plaintiff's March output was at or near the lower end of the normal range for Engineering Leads across HubSpot's engineering organization, based on comparative pull-request data for seventy-one peers for whom such data was available. Notably, the April 18 PIP email itself acknowledges Plaintiff's nine March pull requests. (Ex. B.) HubSpot's subsequent EEOC position statement, however, claimed that Plaintiff "failed to ship any Pull Requests" in March; that characterization is directly contradicted by HubSpot's own contemporaneous written record.

38. On April 25, 2025, Plaintiff asked Khanna directly whether the PIP was based on his first-quarter output. Khanna acknowledged evaluating performance quarterly, then, appearing to recognize the implication, namely that Q1 included five or more weeks of parental leave, pivoted to saying he was looking at the "whole picture" since Plaintiff joined HubSpot, including the pre-leave period,

notwithstanding the written priority framework set out in Exhibit 1.

39. On May 2, 2025, Khanna extended the PIP to May 23, noting an upcoming week-long team onsite in Boston during which Plaintiff was explicitly told he would not be expected to write code.

## G. The Data Privacy Violation

40. On May 6, 2025, while attending the Boston team onsite, Plaintiff first learned of a significant data privacy violation within HubSpot's technical infrastructure. A colleague who had discovered and documented the incident informed Plaintiff of its existence and stated that Khanna had instructed him to cover up the incident. The colleague described a Critical Situation ("CritSit") involving a long-standing bug in HubSpot's platform that caused the system to record user consent to data sharing when no actual consent had been given. The bug had been active since approximately July 12, 2024 and was discovered and fixed on approximately April 9, 2025, a period of approximately nine months.

41. That colleague told Plaintiff that Khanna, acting as the Directly Responsible Individual for the CritSit, had classified the incident as "SEV-NA" (no severity), bypassing the standard internal review process that would otherwise require escalation and remediation. Acting under the direction of Senior Counsel, management elected neither to notify affected customers nor to remediate the improperly created records, leaving the customers of more than 67,000 businesses in ongoing violation of data privacy requirements.

42. Internal estimates in HubSpot's CritSit tracking system showed that the bug had affected more than 40,000 business accounts in North America and more than 27,000 business accounts in the European Union. Because HubSpot collects and processes contact data from the customers of these businesses, the total number of individual data subjects whose consent was misrepresented is substantially higher.

43. The more than 40,000 affected North American business accounts necessarily included customers and their contacts located in New York, whose private information was processed without valid

consent. HubSpot implemented no remediation, issued no notification to affected customers or contacts, and made no report to the New York Attorney General.

44. The consent mechanism violation constitutes a violation of Article 7 of the General Data Protection Regulation, Regulation (EU) 2016/679 ("GDPR"), which requires that consent to data processing be demonstrable, freely given, specific, informed, and unambiguous. A software error causing users to be marked as having consented when they had not does not satisfy these requirements.

45. The violation also implicates HubSpot's obligations as a publicly traded company. HubSpot is listed on the New York Stock Exchange and is subject to disclosure requirements for material cybersecurity incidents under, among other provisions, Securities and Exchange Commission Regulation S-K, Item 106, 17 C.F.R. § 229.106 (effective September 5, 2023). A data breach affecting the customers of more than 67,000 businesses over approximately nine months, with substantial regulatory exposure, constitutes a material incident within the meaning of those requirements. HubSpot did not disclose this incident to investors or to affected customers.

H. **Whistleblower Reports and Escalating Retaliation**

46. On May 16, 2025, two significant concurrent events occurred. First, Plaintiff filed an external third-party whistleblower complaint that included HubSpot's internal documentation of the consent mechanism breach and Khanna's SEV-NA classification. Second, Plaintiff submitted a formal written protest of his PIP to Employee Relations, advising that he had consulted legal counsel.

47. The PIP review meeting that had been scheduled for May 16 was postponed by Khanna to Monday, May 19, 2025. Khanna edited the shared meeting notes during the May 19 meeting but did not update the date reflected in those notes.

48. At the May 19 PIP review, Khanna acknowledged that Plaintiff's performance had improved during the PIP period. Notwithstanding that acknowledgment, Khanna extended the PIP to June 2, 2025, stating that he wanted to see "increased and sustained output." Khanna further stated that Plaintiff's "velocity is good" but that the current output level must now be the baseline, and that

11

any reduction would result in termination.

49. When Plaintiff reported the PIP extension to Belinfanti, Belinfanti described it as "highly non-standard," a contemporaneous acknowledgment by HubSpot's own Employee Relations function that the extension was unusual and lacked sufficient justification.

50. On May 22, 2025, Plaintiff met with Belinfanti for a second time and submitted written documentation of his belief that Khanna was evaluating him based on the time spent on parental leave.

51. On May 28, 2025, Plaintiff identified himself to HubSpot as the employee who had submitted the external whistleblower report about the data privacy violation.

52. On May 29, 2025, Plaintiff met with a HubSpot Compliance representative who requested documentation. Plaintiff located the dedicated Slack channel in which the CritSit had been tracked internally. That channel revealed: (a) internal estimates of the number of affected customer accounts; (b) advice from HubSpot's legal department that "customers should have been able to figure this out themselves," recommending no remediation action; and (c) Khanna's SEV-NA classification of the incident, made under the direction of Senior Counsel.

53. On May 30, 2025, Plaintiff provided the Slack channel records, the estimated scope of the affected customer population, and a document outlining the vulnerability's footprint in HubSpot's codebase to the assigned Compliance representative.

**I. Coordinated Investigation Closures and Termination**

54. On June 2, 2025, the PIP was extended a third time, to June 6. At that meeting, Khanna told Plaintiff he was "doing well" but that Khanna needed to "collect more data and talk to more people on the team."

55. On June 3, 2025, HubSpot closed both investigations simultaneously. At 2:36 P.M., Plaintiff received notice that the investigation into his complaints that his parental leave was being counted against his performance had been closed. At 7:15 P.M. the same day, Plaintiff received notice that

the GDPR whistleblower investigation had been closed as "unsubstantiated." Both closures followed Plaintiff's identification of himself as the whistleblower and his submission of documentary evidence to the Compliance representative. Plaintiff received no substantive explanation for either closure.

56. On June 6, 2025, within days of HubSpot's closure of both investigations, Khanna terminated Plaintiff's employment. Khanna stated that despite Plaintiff's improvement on the PIP, he had not met the bar for the Engineering Lead role or the Senior Software Engineer II role. Khanna appeared visibly uncomfortable during the call and disconnected shortly after delivering the news, leaving Plaintiff with a Human Resources representative.

Comparative pull-request data for seventy-one Engineering Leads for whom data was available in HubSpot's engineering organization demonstrates that Plaintiff's output during the PIP period was competitive with his peers. Other Engineering Leads with lower output during the same period were not placed on PIPs or terminated.

## J. The Four-Instance Pattern of Retaliatory Escalation

57. The following chronological sequence demonstrates a consistent connection between each instance of protected activity and each subsequent adverse employment action.

58. On March 11, 2025, Plaintiff disclosed his upcoming parental leave dates for August and early September. Without any intervening change in his actual performance, Khanna shifted that same day from the "generally satisfactory" rating he had given sixteen days earlier to telling Plaintiff he was "absolutely not meeting expectations."

59. On April 3, 2025, Plaintiff filed a formal HR complaint connecting workplace pressure directly to his parental leave. Exactly fourteen days later, on April 18, 2025, Khanna placed Plaintiff on a Performance Improvement Plan — the stated basis for which directly contradicted the written priority framework Khanna had established on September 9, 2024.

60. On May 16, 2025, Plaintiff filed an external whistleblower complaint and formally protested the

PIP in writing, advising that he had retained counsel. Three days later, at the May 19 PIP review, Khanna acknowledged improved performance but extended the PIP nonetheless — an outcome HubSpot's own Employee Relations representative described as "highly non-standard."

61. On May 28, 2025, Plaintiff identified himself as the author of the whistleblower report to HubSpot's compliance department. Nine days later, HubSpot closed both internal investigations on the same day, the discrimination investigation at 2:36 P.M. and the whistleblower investigation at 7:15 P.M. on June 3, with no substantive explanation for either closure. On June 6, 2025, Khanna terminated Plaintiff's employment, notwithstanding his own statement four days earlier that Plaintiff was "doing well."

62. This repeating pattern is more probative than any single instance of temporal proximity. Each protected activity was followed promptly by a new or escalated adverse action, and the consistency of that sequence across four distinct instances and two separate categories of protected conduct supports an inference of retaliatory animus rather than legitimate performance management.

## CAUSES OF ACTION

### COUNT I
### Title VII of the Civil Rights Act of 1964: Sex Discrimination (Gender Stereotyping)
### Against Defendant HubSpot, Inc.

63. Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

64. Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), makes it unlawful for an employer to discriminate against any individual with respect to the terms, conditions, or privileges of employment because of sex. Sex discrimination under Title VII encompasses discrimination based on gender stereotyping, meaning adverse employment actions taken against an employee because he does not conform to sex-based assumptions about how men and women behave, particularly with respect to domestic and parenting responsibilities. A male employee may bring a sex-stereotyping claim where his employer penalizes him for taking an active parental role, includes

14

leave time in performance calculations in a manner that assumes he should not have taken leave, or otherwise acts on a gendered assumption about the appropriate division of caregiving labor.

65. HubSpot discriminated against Plaintiff on the basis of sex through gender stereotyping in the following respects, among others.

66. Khanna's question, "What does your wife do?", asked in direct response to Plaintiff's disclosure of sleep deprivation from caring for his newborn, reflects a sex-based assumption that nighttime responsibility for an infant is the wife's domain and that a male employee should not be the primary overnight caregiver for his child.

67. Khanna's references to Plaintiff's parental leave as a "vacation," quickly self-corrected but documented on more than one occasion, reflect an implicit view that a male employee's parental leave is discretionary time off rather than a protected period of family caregiving.

68. Khanna's "whole picture" and "almost a year" framing of Plaintiff's performance, applied without any adjustment for the ten weeks he spent on parental leave, reflects a sex-based assumption that Plaintiff's absence from coding during approved leave is properly penalizable.

69. The shift in Plaintiff's performance assessment from "generally satisfactory" to "absolutely not meeting expectations," occurring immediately after Plaintiff confirmed upcoming additional parental leave and without any intervening change in actual performance, reflects animus triggered by Plaintiff's continued exercise of parental rights that Khanna considered inconsistent with the demands of the role.

70. As a direct and proximate result of HubSpot's discriminatory conduct, Plaintiff has suffered and continues to suffer lost wages and benefits, emotional distress, damage to his professional reputation, and other economic and non-economic harm in amounts to be proven at trial.

**COUNT II**
**Title VII of the Civil Rights Act of 1964: Retaliation**
**Against Defendant HubSpot, Inc.**

71. Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

72. Title VII, 42 U.S.C. § 2000e-3(a), prohibits an employer from retaliating against an employee who has opposed any practice made unlawful by Title VII, or who has participated in any investigation, proceeding, or hearing under Title VII.

73. Plaintiff engaged in the following protected activities: filing the March 20, 2025 HR complaint connecting workplace pressure to his parental leave; raising his belief with HubSpot's Employee Relations representative on April 3, 2025 that his leave was being counted against him; and submitting the formal written PIP protest on May 16, 2025 with advice of counsel.

74. HubSpot knew of Plaintiff's protected activities. HubSpot's own Employee Relations representative conducted an intake meeting with Plaintiff on April 3, 2025, at which Plaintiff described his complaints and his belief that his parental leave was being counted against his performance. HubSpot's assertion in its EEOC position statement that complaints were investigated "confidentially" does not mean the accused supervisor was not interviewed; the question of Khanna's knowledge presents at minimum a genuine dispute of material fact.

75. HubSpot subjected Plaintiff to the following adverse employment actions: PIP placement on April 18, 2025; three PIP extensions despite acknowledged improvement; escalating performance criteria after each extension; simultaneous closure of both internal investigations on June 3, 2025; and termination on June 6, 2025. Any of these actions, and certainly the aggregate course of conduct, would dissuade a reasonable employee from making or supporting a charge of discrimination.

76. The causal connection between Plaintiff's protected activity and the adverse actions is demonstrated by the four-instance temporal pattern described above, the "highly non-standard" characterization of the PIP extension by HubSpot's own Employee Relations function, the coordinated simultaneous closure of both investigations, and HubSpot's own position statement's factual inaccuracies regarding Plaintiff's March output.

77. HubSpot's cumulative course of conduct comprising escalating scrutiny, shifting performance expectations, repeated PIP extensions, and ultimate termination, also constitutes a retaliatory hostile work environment, in that the aggregate conduct would dissuade a reasonable employee from making or supporting a charge of discrimination.

78. As a direct and proximate result of HubSpot's retaliatory conduct, Plaintiff has suffered and continues to suffer the damages described in Count I.

**COUNT III**
**New York State Human Rights Law: Sex Discrimination**
**Against HubSpot, Inc. and Varun Khanna**

79. Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

80. The New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296(1)(a), prohibits employers from discriminating against any individual in the terms, conditions, or privileges of employment because of sex.

81. The NYSHRL was substantially amended by 2019 N.Y. Laws ch. 160, effective October 11, 2019. The 2019 amendments expanded the NYSHRL's protections in the following respects material to this action. First, the discrimination threshold was lowered: it is now unlawful to subject any individual to "inferior terms, conditions or privileges of employment" because of a protected characteristic, eliminating the prior requirement that conduct be "severe or pervasive." N.Y. Exec. Law § 296(1)(h). Second, no comparator is required: the statute expressly provides that "nothing in this section shall imply that an employee must demonstrate the existence of an individual to whom the employee's treatment must be compared." N.Y. Exec. Law § 296(1)(h). Third, the NYSHRL must be "construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal civil rights laws have been so construed." N.Y. Exec. Law § 300. Fourth, punitive damages are now available, and attorneys' fees "shall" be awarded to prevailing plaintiffs. N.Y. Exec. Law § 297(10). NYSHRL claims must be analyzed separately and independently from federal standards.

82. The same discriminatory conduct alleged in Count I constitutes discrimination in violation of the NYSHRL, evaluated under the more protective standards of the 2019 amendments.

83. Defendant Khanna is individually liable under NYSHRL § 296(1) as a supervisory employee who directly engaged in the discriminatory conduct alleged herein, and under § 296(6), which imposes liability on any person who "aids, abets, incites, compels or coerces" the doing of any act forbidden by the NYSHRL. Khanna's direct commission of the discriminatory acts — including the stereotyping comment, the reversal of the written September 9, 2024 priority framework, the PIP, and the termination — establishes individual liability under both provisions.

84. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered the damages described in Count I, together with punitive damages and attorneys' fees as provided by the NYSHRL.

## COUNT IV
### New York State Human Rights Law: Familial Status Discrimination
### Against HubSpot, Inc. and Varun Khanna

85. Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

86. The NYSHRL, N.Y. Exec. Law § 296(1)(a), prohibits discrimination in employment based on "familial status." The NYSHRL defines familial status to include the status of being the parent of a child under eighteen years of age. N.Y. Exec. Law § 292(26). The 2019 amendments described in Count III apply with equal force to familial status discrimination claims.

87. Plaintiff is the parent of a child born November 27, 2024, who was under eighteen at all relevant times.

88. Defendants discriminated against Plaintiff based on his familial status as a new parent by: penalizing him for taking parental leave; including the leave period in performance calculations; shifting his role expectations immediately following his disclosure of upcoming additional parental leave; and terminating him in a manner causally connected to the exercise of his parental leave rights. This familial status discrimination claim is independent of and in addition to the sex-

18

stereotyping theory.

89. Defendant Khanna is individually liable on this Count for the reasons stated in Count III. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered the damages described in Count I, together with punitive damages and attorneys' fees as provided by the NYSHRL.

**COUNT V**
**New York State Human Rights Law: Retaliation**
**Against HubSpot, Inc. and Varun Khanna**

90. Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

91. NYSHRL § 296(1)(e) makes it unlawful for an employer to retaliate against any person because he has opposed any practice forbidden by the NYSHRL or has filed a complaint, testified, or assisted in any proceeding under the NYSHRL. The 2019 amendments to the NYSHRL apply to retaliation claims, including the lowered adverse-action threshold.

92. Plaintiff engaged in protected activity under the NYSHRL by opposing practices he reasonably believed to be unlawful discrimination: filing the March 20 HR complaint; raising familial status and sex discrimination concerns with HubSpot's Employee Relations representative on April 3; formally protesting the PIP as retaliatory on May 16 with advice of counsel; and providing documentary support for his complaints on May 22.

93. Defendants subjected Plaintiff to the adverse employment actions described in Count II in response to his protected activity.

94. Defendant Khanna is individually liable on this Count for the reasons stated in Count III.

95. As a direct and proximate result of Defendants' retaliatory conduct, Plaintiff has suffered the damages described in Count I, together with punitive damages and attorneys' fees as provided by the NYSHRL.

19

## COUNT VI
## New York Labor Law § 740: Whistleblower Retaliation
## Against Defendant HubSpot, Inc.

96. Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

97. New York Labor Law § 740, as amended effective June 25, 2022, and as further amended with retroactive effect to January 26, 2022 by 2023 N.Y. Laws ch. 676, prohibits an employer from taking retaliatory action against an employee because the employee discloses, or threatens to disclose, an activity, policy, or practice of the employer that the employee reasonably believes constitutes a violation of law, rule, regulation, executive order, or rule of court.

98. Plaintiff was and is an "employee" within the meaning of NYLL § 740(1)(a). HubSpot was and is an "employer" within the meaning of NYLL § 740(1)(b).

99. The consent mechanism bug described in the Factual Allegations constitutes violations of multiple laws, rules, and regulations, each of which provides an independent basis for the protected activity element of this claim.

100. HubSpot violated the New York SHIELD Act, N.Y. Gen. Bus. Law §§ 899-aa and 899-bb, which require any business owning or licensing computerized data containing private information of New York residents to maintain reasonable safeguards protecting the security, confidentiality, and integrity of that information, and to notify affected residents and the Attorney General upon a breach. A software defect that systematically recorded false consent for the processing of private information is a failure to maintain the reasonable safeguards the statute requires. HubSpot issued no notification to affected New York customers or contacts and made no report to the Attorney General.

101. HubSpot's misrepresentation of consent constitutes an unfair or deceptive act or practice in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. HubSpot represented to its business customers that their contacts had provided valid consent to data sharing when the

bug systematically recorded false consent, deceiving customers about the lawfulness of their data processing operations in a manner the FTC has consistently treated as actionable.

102. The GDPR violation, Regulation (EU) 2016/679, Article 7, further establishes the character and scope of the underlying conduct, corroborated by HubSpot's own internal estimates of the affected population and its deliberate decision, under the direction of Senior Counsel, to take no corrective action.

103. Plaintiff had a reasonable belief that the foregoing conduct constituted violations of law, rule, and regulation. That belief is well-founded by the plain text of each applicable provision, the internal documentation of the incident in HubSpot's own systems, and HubSpot's affirmative decision to conceal rather than remediate the violation. Plaintiff disclosed this violation through: an external third-party whistleblower report filed on May 16, 2025; his identification of himself as the whistleblower on May 28, 2025; and his submission of documentation to HubSpot's Compliance representative on May 29 and 30, 2025.

104. HubSpot retaliated against Plaintiff for these disclosures by: closing both investigations on June 3, 2025; and terminating his employment on June 6, 2025.

105. As a direct and proximate result of HubSpot's retaliatory conduct, Plaintiff has suffered the damages described in Count I and seeks the remedies available under NYLL § 740(5), including reinstatement or front pay in lieu thereof, back pay, restoration of benefits, attorneys' fees and costs, and the civil penalty provided by statute.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Jonathan Turnbull-Reilly respectfully requests that this Court enter judgment in his favor and against Defendants, and award the following relief:

**Declaratory Relief**

    a.   A declaration that Defendants' conduct violated Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law, and New York Labor Law § 740;

**Injunctive Relief**

    b.   An injunction prohibiting Defendants from continuing to engage in discriminatory, retaliatory, or otherwise unlawful employment practices;

    c.   Reinstatement of Plaintiff to his position as Engineering Lead, or, in the alternative, an award of front pay in lieu of reinstatement;

**Economic Damages**

    d.   Back pay, including lost base salary of $245,000 per year from June 6, 2025, lost management bonuses of 8% of base salary, and lost restricted stock unit vesting, including the vesting events of July 1, September 1, October 1, and December 1, 2025 totaling approximately $82,087, together with all subsequent vesting events through the date of judgment or reinstatement, plus prejudgment interest;

    e.   All other economic damages, including lost benefits, arising from Defendants' unlawful conduct;

**Non-Economic and Punitive Damages**

    f.   Compensatory damages for emotional distress, loss of career opportunity, and reputational harm in amounts to be determined by the jury;

    g.   Punitive damages against HubSpot under Title VII and the NYSHRL in amounts to be determined by the jury;

    h.   The civil penalty available under NYLL § 740(5);

22

**Fees, Costs, and Other Relief**

i.   Attorneys' fees and costs as mandated by the NYSHRL, N.Y. Exec. Law § 297(10), and as available under Title VII, 42 U.S.C. § 2000e-5(k);

j.   Post-judgment interest on all monetary awards; and

k.   Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable, pursuant to Federal Rule of Civil Procedure 38(b).

## RESPECTFULLY SUBMITTED

Dated: May 7, 2026

**Geoffrey Kalender, PC**

_____
By: Geoffrey Kalender
447 Broadway, 2nd Floor
New York, NY 10013
929-489-0636
gk@employmentlawgk.com

## EXHIBIT LIST

Exhibit 1: Slack message from Varun Khanna to Jonathan Turnbull-Reilly, September 9, 2024, establishing priority framework for the Engineering Lead role

Exhibit 2: Email from Varun Khanna to Jonathan Turnbull-Reilly, April 18, 2025, re: "Follow up from our conversation" (Performance Improvement Plan)

Exhibit 3: Equal Employment Opportunity Commission Notice of Right to Sue, Charge No. 525-2025-02445, received February 6, 2026